# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### MAY 1997 SESSION



**FILED**

November 17, 1997

**Cecil W. Crowson**
**Appellate Court Clerk**

|  |  |
|---|---|
| **STATE OF TENNESSEE,** | ) |
|  | ) |
| Appellee, | ) C.C.A. No. 01C01-9604-CC-00150 |
|  | ) |
|  | ) Lincoln County |
| V. | ) |
|  | ) Honorable Charles Lee, Judge |
|  | ) |
| **JERRY RAY COOPER,** | ) (Murder--Second Degree) |
|  | ) |
| Appellant. | ) |
|  | ) |

FOR THE APPELLANT:

Robert D. Massey
Roger N. Hays
209 West Madison Street
Pulaski, TN 37160

FOR THE APPELLEE:

Charles W. Burson
Attorney General & Reporter

Daryl J. Brand
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN  37243-0493

W. Michael McCown
District Attorney General

Weakley E. Barnard
Assistant District Attorney General
P.O. Box 787
Fayetteville, TN  37334

OPINION FILED: _____

**REVERSED AND REMANDED**

**PAUL G. SUMMERS,**
Judge

**O P I N I O N**

The appellant, Jerry Ray Cooper, was indicted for first degree murder in Lincoln County and pled not guilty based on self defense. In August 1995, a jury found the appellant guilty of second degree murder. Judge Charles Lee sentenced the appellant to eighteen years in the Tennessee Department of Correction. The appellant presents six issues for our review:

1. Whether the evidence was sufficient to convict the appellant of second degree murder and the jury's verdict is therefore contrary to the law and the evidence.

2. Whether the trial court erred by not requiring the district attorney general's office to recuse itself from the prosecution of this case.

3. Whether the trial court erred in its denial of the appellant's request to withdraw the jury instruction with regard to sentencing ranges which included provisions concerning truth in sentencing.

4. Whether the trial court erred in its instruction to the jury regarding possible release dates on the offense charged as well as lesser included offenses because the instruction included the possibility of the appellant being sentenced as a mitigated offender.

5. Whether the verdict in this case should be set aside because the truth in sentencing statute and its resulting instructions are unconstitutional under the United States Constitution and the Tennessee Constitution.

6. Whether the jury inappropriately considered the jury instructions given as relates to sentencing ranges and truth in sentencing.

We respectfully reverse the judgment of the trial court and order that the appellant be granted a new trial.

I. Facts

The facts of this case illustrate how violent episodes involving two men fighting over a woman for a three-year period inevitably led to a deadly resolution. In November 1991, Katie Womack and Henry Womack, the deceased, divorced after twenty-four years of marriage. Included in the couple's divorce decree was a provision for Henry Womack to pay the $40,000 mortgage on the house in which Katie Womack resided. Henry Womack apparently

resented having to pay this mortgage. He would not only enter the house and rummage through his ex-wife's belongings, but he would also search through her telephone bills and call the telephone numbers of men that she had supposedly dated.

In February 1992, Katie Womack met Jerry Ray Cooper, the appellant. Mr. Cooper, a resident of Alabama, began dating Katie Womack and continued to date her until the shooting of Henry Womack three years later. In February 1992, Henry Womack told his ex-wife that if she went out with Jerry Cooper again, he was going to quit paying the mortgage on the house. Henry Womack subsequently became delinquent on two or three mortgage payments.

In September 1992, Katie Womack and Jerry Cooper attended a go-cart race in which Ms. Womack's son, Matthew, was a participant. Henry Womack was also at the go-cart track. Henry made the statement to Jerry that "you may be her man now, but you will be my man," and told Katie that he would kill that son of a bitch [Jerry]. Katie, who was outside of the race track, tried to get back into the races, but Henry blocked her from entering. Jerry Cooper interceded on Katie's behalf by asking the manager of the races to go to Henry and see that Katie could return. Shortly thereafter, Jerry and Katie left the race track. Katie told Jerry about Henry's statement that he was going to kill him. Jerry Cooper went to the authorities in Lincoln County and reported this threat. However, Katie persuaded Jerry not to have a warrant issued for Henry because she feared that her children would hate Jerry for having Henry arrested.

The problems involving these three individuals continued. Sometime after the first of the year in 1993, Henry tore up Katie's earrings, which he assumed were a gift from Jerry; he tore up a picture of Jerry and his kids that Katie had; and once, he dumped out Katie's purse, breaking her makeup and perfume onto her outfit before her date with Jerry.

In July 1993, Henry told Katie that if she was going out with Jerry not to come back to the house because he, Henry, was going to move back into the house. Henry boxed up Katie's clothes, traveled to Alabama, and dumped them onto Jerry Cooper's driveway. Katie spent the night at Jerry's house, and when she arrived at her house, Henry had moved back into the house.

On one occasion when Jerry brought Katie home from a date, Katie had trouble getting into her own house because Henry had locked the storm door. While Jerry shined his car lights on the door so that Katie could see, Katie beat on the door until Henry finally opened it. Henry, clad only in very brief underwear, waved to Jerry as he backed out of the driveway.

On July 31, 1993, Jerry brought Katie home from a date, and again she had trouble getting into her house. Henry, who ran from behind the house, chased Jerry away, threw something at his car, and then ran along beside his car. Jerry Cooper did not stop. Although it is unclear who called first, Henry spoke to Jerry, who was on his car phone, and wanted to know where Jerry was located. Again, Jerry Cooper did not tell Henry Womack where he was. Henry, with a shotgun in hand, left hunting for Jerry Cooper, but before he left, he took all the phones out of Katie's house, presumably so that Katie could not call Jerry to warn him that Henry was looking for him. Unbeknownst to Henry, Katie had hidden one phone in the house. Katie told Jerry that Henry had a shotgun when he went looking for him.

Two weeks later on August 14, 1993, Henry Womack was still living in Katie Womack's house. Katie was planning to see Jerry that evening, and Henry told her that if she went it would be her last time. Katie called Jerry and told him that she had better not go because she was afraid that something bad would happen. Katie then suggested that she and Jerry meet beside an area church.

When Katie arrived, Jerry was parked beside the church, and Katie got into Jerry's car, an older model 280ZX. When Katie and Jerry came out onto the road, Henry, who was in his truck, blocked the road. Jerry pulled around Henry's truck, and when he did, Jerry rolled down his window and asked what the problem was. Henry then called Jerry a "yellow belly chicken shit son of a bitch." Jerry Cooper drove off. At this point, Henry supposedly threw something at Jerry Cooper. As Katie and Jerry Cooper were headed in a direction away from Henry, Katie testified that she heard at least three gunshots and feared that the bullets might hit the car's gas tank and blow up the car. She also testified that Jerry Cooper was trying to get a hold on his gun but could not. Jerry turned around and headed back toward Henry's truck. As Jerry Cooper was driving back toward Henry, Katie was dialing 911 on the car phone because she thought Henry was coming after her. Henry Womack had fired four shots at Jerry Cooper and Katie Womack. Katie testified that Jerry did not shoot at Henry during the August 14th incident, and at no time that day did Jerry Cooper show Henry Womack his gun. Katie testified that Jerry had carried a gun for as long as she had known him. Although he did not shoot at Henry Womack or indicate that he had a gun, Jerry Cooper did accidentally discharge his gun and shoot a hole in the dashboard of his car. Jerry Cooper went that same day to the authorities in Lincoln County, explained what had occurred, and secured a warrant against Henry Womack.

Several days later, a judge ordered Henry Womack to move out of Katie Womack's house. Also, Henry was arrested for aggravated assault and was subsequently put on pretrial diversion with a memorandum of understanding that restrained him from having contact with Jerry Cooper. During this time, Katie discovered that Henry had a pistol. Although he had never owned a pistol before, Henry had owned a shotgun; but he had not hunted with it in a number of years. Katie found Henry's pistol and hid it because she feared he would use it on Jerry. The gun remained hidden until Henry demanded that the pistol be returned to him, which Katie did.

On October 7, 1993, Jerry Cooper filed a civil suit against Henry Womack for damages. There was an agreed order restraining Henry Womack from "threatening, harassing, assaulting, or harming Jerry Cooper and vice versa."

On May 1, 1994, Jerry Cooper, who now knew that Henry Womack had a pistol, came to Katie's house, and she invited him inside. Jerry's car was outside the house. Shortly thereafter, at approximately 12:45 a.m., Henry came to the door of Katie's house and began to beat on it. Katie told him to leave. Henry told her that he was not leaving until that gray headed son of a bitch [Jerry Cooper] came out. Jerry Cooper had a gun inside the house, but he did not go outside. Cooper, with a pistol in one hand, called 911 for help, all the while keeping Henry in his eyesight. Jerry did not chase after Henry with the gun, and he did not threaten Henry with the gun. By the time the authorities arrived, Henry was gone. Jerry went to the authorities in Lincoln County, and they issued a warrant for his arrest. As a result of this contact, a judge found Womack in contempt of court for violating the restraining order and reserved judgment on the issue of contempt, further ordering Jerry Cooper and Henry Womack not to visit the property of Katie Womack without permission. The assault warrant was dismissed by a Lincoln County General Sessions Judge because he felt no assault had been committed. District Attorney General Mike McCown, who represented the state at the appellant's trial, was also the prosecutor in that case.

Despite all the problems they had encountered, Katie Womack and Jerry Cooper continued to date. Henry would drive by public places that Katie and Jerry would frequent. Because Katie and Henry's daughter and granddaughter resided in the same house with Katie, Katie told Henry that he could come to her house any time he desired. By February 1995, the stress precipitated by his problems with Henry Womack caused Jerry Cooper to seek medical treatment for his nerves from Dr. Judy Isenberg, an Alabama doctor. During February

1995, she treated him for anxiety and depression. On February 22, 1995, the civil trial against Henry Womack was held, and on March 2, 1995, Jerry Cooper was awarded $1,100 in damages against Henry Womack. In that judgment was a permanent injunction restraining the parties from having any contact with each other.

On March 9, 1995, a little more than two weeks before the shooting, Jerry Cooper, who had experienced back trouble for quite some time, underwent back surgery. Dr. Ira Denton, who performed the surgery, testified that, in his opinion, Jerry Cooper was incapable of running, fighting, or physically defending himself on the day of the shooting.

On March 24, 1995, the day before the shooting, Katie and Jerry went on a date in Fayetteville, Tennessee before driving back to Alabama to spend the night at Jerry's house. Saturday morning, March 25, 1995, Jerry and Katie went to Wal-Mart in Fayetteville to get a lawn mower and gas grill that Katie had put in the lay-away. Katie and an employee at Wal-Mart, not Jerry Cooper, loaded the grill and mower into Jerry's truck. Around 11:00 a.m. Katie and Jerry arrived at Katie's house on Molina Road near Fayetteville to put away the lawn mower and the gas grill. Jerry Cooper backed his truck past Katie's driveway into the backyard where a shed was located.

While Jerry backed his truck up toward the shed, Katie went inside the house, where her adult daughter, Christy Norman, was talking with her father, Henry Womack. Henry was at Katie's mother's house, approximately two-tenths of a mile east of Katie's home. Katie spoke with Henry for a brief time, and Jerry Cooper, who was outside, heard Katie "hollering, 'Henry,' he is leaving." Katie went outside and told Jerry to leave. Katie testified that Jerry responded that Henry was supposed to leave him alone and that he was not leaving. Christy Norman, the deceased's daughter, testified that the amount of time that passed

from the time Katie told Jerry to leave until Henry Womack arrived was five minutes or less.

Katie, along with some help from Jerry, unloaded the mower from the back of the truck, and within minutes, Henry Womack drove quickly up the driveway in a blue Datsun 280ZX car, a car similar to the 280ZX that Jerry Cooper owned. According to Cooper, who is six feet, four inches in height, he could see into the 280ZX; and he testified that Womack had a pistol in his right hand which was held close to the side. Womack pulled past the driveway into the backyard and just past Cooper's pickup truck. The driver's side door of each vehicle was facing each other, about nine feet apart.

According to Cooper, he feared that Womack was going to kill him, despite all the court orders in effect for Womack to stay away from him. Cooper got his .380 semi-automatic pistol from the seat of his truck and loaded the clip. According to Cooper, Womack was coming out of his car when Cooper turned around from loading his gun. Cooper testified that he thought Womack had a pistol in his hand when he got out of his Datsun 280ZX, so he fired at Womack in order to save his life. However, on cross-examination, Cooper admitted that he did not actually see a gun when Womack got out of the car. Cooper fired five shots rapidly.

One bullet hit the dashboard, near the speedometer. One bullet hit above the left rear tire. The remaining three shots hit Womack: one bullet broke his right collarbone; one bullet punctured his right lung; and one bullet lodged in his upper left arm bone. Dr. Charles Harlan, the medical examiner, testified that the front chest wound, which punctured Womack's right lung, was the fatal wound. Therefore, although Womack apparently tried to run away from Cooper, Womack was not shot from behind.

Katie Womack, the ex-wife of Henry Womack, and Christy Norman, Henry Womack's daughter, were at the scene of the shooting. According to Katie Womack, Henry did not have a gun; and as Henry got out of his car, he did not say anything to Jerry. Katie testified that she knocked Jerry's arm as another shot was fired, although Jerry Cooper disputed this testimony. Christy Norman, who watched the events unfold from a sliding glass door in Katie's house several feet away, testified that her father, Henry, had nothing in his hands as he drove into the backyard.

After Henry Womack had been shot, Jerry Cooper left in his truck, and started to telephone an attorney who had represented him in his civil suit against Henry Womack. When he was unable to reach that attorney, he tried to reach the attorney who had helped him obtain a divorce, but again, on a Saturday, he was unable to reach an attorney. In the meantime, the sheriff's department arrived at the scene of the shooting. According to C. C. Thornton, a sheriff's deputy, Sheriff Tom Bean, who died before the appellant's trial, found Henry Womack's .25 caliber pistol in the console between the bucket seats of his Datsun 280ZX. The pistol and the clip, which was not in the pistol, were underneath papers in the console. Deputy Thornton also testified that no fingerprints were taken of any physical objects at the scene of the shooting or of any of the three family members of the deceased who were present at the scene of the shooting.

Jerry Cooper, who threw his gun off a bridge into the Tennessee River, called the sheriff's department and turned himself in after speaking with a Fayetteville attorney the following Monday.

## II. Sufficiency of the Evidence

First, the appellant argues that the evidence is insufficient to convict him of second degree murder. The appellant maintains that because "the record is

replete with previous threats, previous acts of violence, numerous orders of various courts for Henry Womack, the deceased, to stay away from and have no harassing type contact with the appellant, " he should have been found guilty of the lesser included offense of voluntary manslaughter, which requires "adequate provocation sufficient to lead a reasonable person to act in an irrational manner."

The appellant concedes that whether a defendant is convicted of second degree murder or voluntary manslaughter is typically a jury question. However, appellant argues that his case is atypical because of the jury instruction that was given regarding ranges of punishment. He contends that "the jury took into consideration the sentencing ranges and truth in sentencing instruction for voluntary manslaughter in rendering their verdict as opposed to looking at the adequate provocation issue as is required."

The state, however, argues that the evidence is sufficient to convict the appellant of second degree murder. The state maintains that there was no evidence of any provocation on March 25, 1995, the day of the shooting, that would warrant a finding of voluntary manslaughter and further asserts that the evidence indicates that Jerry Cooper's killing of Henry Womack was "knowing and unprovoked," thereby warranting his second degree murder conviction.

Great weight is accorded jury verdicts in criminal trials. Jury verdicts accredit the state's witnesses and resolve all evidentiary conflicts in the state's favor. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); State v. Banes, 874 S.W.2d 73, 78 (Tenn. Crim. App. 1993). On appeal, the state is entitled to both the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832 (Tenn. 1978). Moreover, guilty verdicts remove the presumption of innocence, enjoyed by defendants at trial, and replace it with a presumption of guilt. State v. Grace, 493 S.W.2d 474 (Tenn. 1973). Appellants, therefore, carry the burden of overcoming a presumption of guilt when appealing jury convictions. Id.

When appellants challenge the sufficiency of the evidence, this Court must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979); Tenn. R. App. P. 13(e); State v. Duncan, 698 S.W.2d 63 (Tenn. 1985). The weight and credibility of a witness' testimony are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542 (Tenn. 1984); Byrge v. State, 575 S.W.2d 292 (Tenn. Crim. App. 1978).

The three-year history between these two men clearly indicates that the appellant was undoubtedly provoked on numerous occasions. He repeatedly sought help not only from law enforcement but also from the courts, and unfortunately, in the end, he resorted to self help. The appellant based his defense on self defense, not provocation; and the jury in Lincoln County chose to believe the state's witnesses, which included primarily the deceased's ex-wife and adult daughter. Because this jury as the triers of fact believed the evidence sufficient to convict the appellant of second degree murder and not voluntary manslaughter, we must uphold their verdict. The evidence is sufficient.

### III. Disqualification of the District Attorney General's Office

Second, the appellant argues that the trial court erred by not disqualifying the district attorney general's office from the prosecution of the appellant's case. The appellant asserts that a conflict of interest existed for the district attorney general and his staff "due to the previous representation of the appellant [by the district attorney general's office] when he was the victim of crimes committed by the deceased." The appellant contends that "an appearance of impropriety"

exists and "that once a defendant has shown a substantial relationship existing between the pending case and the manner in which the prosecuting attorney was previously representing in essence the defendant, that there should be a presumption that the prosecuting attorney shared information and/or possessed information which should not be divulged." The appellant maintains that district attorney general Mike McCown, in effect, represented him, and therefore, there should be the presumption that McCown "shared information and/or possessed information which should not be divulged."

The state argues, however, that the trial court properly refused to disqualify the district attorney general's office. First, the state argues that the appellant filed his motion to disqualify ten days before the trial was scheduled to begin, so disqualification of the district attorney general would have necessitated a continuance. Therefore, the state maintains that the motion was not timely filed under the local rules, and consequently, the trial court did not abuse its discretion in denying the appellant's motion.

Second, the state argues that the motion to disqualify the district attorney's office was without merit because the appellant's argument that the district attorney general represented him in the aggravated assault charge against Henry Womack is simply incorrect. The state maintains that because the district attorney general represents the state, an attorney-client relationship never existed between Mr. Cooper and district attorney general McCown. Therefore, "the district attorney has no obligation, under law or the principles of professional ethics, to preserve any confidences of Cooper's." The state also notes that the assault case against Henry Womack was resolved more than a year before the shooting of Womack, so there was no "'confidence' communicated by Cooper to the district attorney at any time, but certainly not after January 1994."

The trial judge in this case apparently thought that the decision of whether or not to disqualify the district attorney general's office rested with the district

attorney general himself. However, the decision to disqualify a district attorney general or someone on his or her staff rests with the trial judge. State v. Tate, 925 S.W.2d 548, 549-50 (Tenn. Crim. App. 1995).

Based upon the record before us, the appellant made a motion to disqualify the district attorney general and his office, and the trial judge mistakenly thought that he did not have the authority to disqualify the district attorney general or his staff. Although Tate had not been decided at the time of this case, the trial court can disqualify the district attorney general and his or her staff if necessary. Tate , 925 S.W.2d at 549. However, the appellant did not develop or present evidence, such as calling district attorney general McCown as a witness, to support his argument. Therefore, this issue is without merit based on the record before us. However, upon a new trial, this issue may be addressed again if the appellant presents sufficient evidence to support his argument that the district attorney general and his staff should be disqualified. See State v. Tate, 925 S.W.2d 548 (Tenn. Crim. App. 1995).

IV. Constitutionality of Tennessee Code Annotated § 40-35-201(b)

The appellant's issues three through six fall within the realm of jury instructions and thus are intertwined. We will address each issue raised by the appellant in his brief, but in an order different from that presented by the appellant.

At the center of issues three through six is Tenn. Code Ann. § 40-35-201(b) (Supp. 1995), which follows:

**40-35-201. Issue of guilt and sentence to be tried separately -- Instructing jury on possible sentences -- Parole considerations. --**

. . .

(b)(1) In all contested criminal cases, except for capital crimes which are governed by the procedures contained in §§ 39-13-204 and 39-13-205, upon the motion of either party, filed with the court prior to the selection of the jury, the court shall charge the possible penalties for the offense charged and all lesser included offenses.

(2)(A)(I) When a charge as to possible penalties has been requested pursuant to subdivision (b)(1), the judge shall also include in the instructions for the jury to weigh and consider the meaning of a sentence of imprisonment for the offense charged and any lesser included offenses. Such instruction shall include an approximate calculation of the minimum number of years a person sentenced to imprisonment for the offense charged and lesser included offenses must serve before reaching such person's earliest release eligibility date. Such calculation shall include such factors as the release eligibility percentage established by § 40-35-501, maximum and minimum sentence reduction credits authorized by § 41-21-236 and the governor's power to reduce prison overcrowding pursuant to title 41, chapter 1, part 5, if applicable.

(ii) Such instructions to the jury shall also include a statement that whether a defendant is actually released from incarceration on the date when such defendant is first eligible for release is a discretionary decision made by the board of paroles based upon many factors, and that such board has the authority to require the defendant to serve the entire sentence imposed by the court.

(B) On an annual basis, the department of correction shall provide each judge exercising criminal trial court jurisdiction with the approximate calculation required in subdivision (2)(A). Such calculation shall be broken down to show the effect of each factor used in making such calculation. If the calculation provided by the department to the judges changes because of a change in the law or correctional policy, court intervention, the governor's prison overcrowding policy or any other such circumstance, the department shall send a revised calculation to the judges as such changes occur.[1]

The appellant asserts that this statute is unconstitutional on the grounds that it allows the trial judge to charge the jury regarding the facts of a case, that it violates the separation of powers doctrine of the Tennessee Constitution, and that it is unconstitutionally vague. Furthermore, the appellant notes in his brief that the trial court, at the time of the trial in August 1995, also believed that this statute was unconstitutional because "the statute require[d] the jury to take something into consideration which ha[d] nothing to do with guilt or innocence as a factor for their deliberations." The trial court's comments about the constitutionality of the statute are addressed in Section VII.

---

[1]This statute, which was amended in 1994 to add subsection (b)(2), provides for a jury instruction regarding a defendant's range of punishment. This amendment became effective on July 1, 1994, more than a year before the appellant's trial.

-14-

First, the appellant contends that Tenn. Code Ann. § 40-35-201(b) (Supp. 1995) violates Article VI, Section 9 of the Tennessee Constitution: "The Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." Apparently, the appellant's argument is that although a trial court's instruction regarding a range of punishment for a conviction does not assume facts, a judge has to assume several facts when advising the jury of the earliest possible release eligibility date of a defendant. For example, the appellant argues that the court must consider facts in determining the sentence range of the defendant, which could include mitigating and enhancing factors, in advising the jury on the earliest release eligibility date, and thus, this violates Article VI, Section 9.

Second, the appellant also asserts that this statute violates Article II, Sections 1 and 2 of the Tennessee Constitution, requiring the separation of powers into three branches of government. Appellant argues that this statute permits the legislature to invade the province of the judicial branch of the government, which is charged with the responsibility of ensuring "that jury instructions do not compromise the integrity of the jury."

Third, the appellant also argues that the statute is unconstitutionally vague, citing Farris v. State, 535 S.W.2d 608 (Tenn. 1976). The appellant notes that the court in Farris found the statute in that case vague because of the speculative nature "with respect to certain powers and duties of the Board of Pardons and Paroles, good behavior allowances, and the allowance of honor time" in determining parole eligibility. Farris, 535 S.W.2d at 609. He asserts that his case is analogous to Farris.

The state, however, argues that Tenn. Code Ann. § 40-35-201(b) (Supp. 1995) is constitutional. The state maintains that this statute does not violate Article VI, Section 9 of the Tennessee Constitution. The state asserts that this

statute does not require factual assumptions because "[b]y referring to an objective, abstract, indefinite person, rather than to the specific defendant, the statute provides that the instruction not contain factual assumptions about the particular defendant before the jury, but only information as to the absolute minimum of time which any offender must serve for a given offense." Also, the state notes that the information supplied to the jury is furnished by the Department of Correction pursuant to Tenn. Code Ann. § 40-35-201(b)(2)(B) (Supp. 1995), and consequently, does not allow "speculation or assumption by the trial judge."

The state further contends that the statute does not violate the separation of powers of Article II, Sections 1 and 2 of the Tennessee Constitution, citing State v. Cook, 816 S.W.2d 322 (Tenn. 1991). Our Supreme Court in Cook observed that "[t]he Legislature . . . certainly has the right and power to direct the judicial process. They have said that where a defendant wants his trial jury to know the range of possible punishments resulting from convictions that he is entitled to have that information conveyed to the jury." Cook, 816 S.W.2d at 327. Thus, the state asserts that Tenn. Code Ann. § 40-35-201(b) (Supp. 1995) does not intrude upon the judicial process, and consequently, does not violate the separation of powers doctrine of the Tennessee Constitution.

With respect to the appellant's argument that this statute is unconstitutionally vague, the state argues that because only two members of the Farris court found the statute "void for vagueness," Farris is not authority for the appellant's argument that Tenn. Code Ann. § 40-35-201(b) is unconstitutional.

This Court has held that Tenn. Code Ann. § 40-35-201(b) is constitutional. State v. King, No. 02C01-9601-CR-00032 (Tenn. Crim. App. at Jackson, Oct. 22, 1996), perm. app. granted, (Tenn. Mar. 10, 1997). In King, this Court noted that at the time Farris was decided in 1976, a jury determined a defendant's sentence as well as his or her guilt. Id. at *3. Furthermore, as this

-16-

Court in King noted, the Farris court stated that "[t]he error which we find in the charge to the jury bears only upon the question of punishment and has no relation to the jury's finding of guilt or innocence." Id. at *3 (citing Farris v. State, 535 S.W.2d 608, 614 (Tenn. 1976)). Like the court in King, I believe that because the error in the jury instruction in Farris relates only to punishment and not to guilt or innocence, Farris is not relevant to this case.

Furthermore, this Court in King addressed the issue of whether Tenn. Code Ann. § 40-35-201(b) (Supp. 1995) allows the legislature to intrude upon the powers of the judiciary. In that case, this Court observed that "the statute under consideration in Farris required the trial judge to instruct as regards to parole eligibility at a time when sentencing was a jury function. . . . [Therefore,] Farris' applicability is limited under our current sentencing laws." Id. at *4. Thus, I conclude that Farris has limited applicability in this case as well.

Accordingly, I conclude that Tenn. Code Ann. § 40-35-201(b) (Supp. 1995) is constitutional.

V. Timing of Motion Pursuant to Tennessee Code Annotated § 40-35-201(b)

The appellant argues that the trial court erred by not allowing him to withdraw his request for the sentencing range instruction pursuant to Tenn. Code Ann. § 40-35-201(b) (Supp. 1995). The pertinent part of the statute follows:

> (b)(1) In all contested criminal cases, except for capital crimes which are governed by the procedures contained in §§ 39-13-204 and 39-13-205, upon the motion of either party, filed with the court prior to the selection of the jury, the court shall charge the possible penalties for the offense charged and all lesser included offenses.

(emphasis added). The appellant contends that the trial court's denial for his request to withdraw the motion violates his due process rights by preventing him from withdrawing his intent to exercise his statutory right for the jury to know the range of punishment.

-17-

The state argues that the statute should be interpreted to give effect to the legislature's purpose and intent, and that the legislature clearly intended for a request regarding a range of punishment to be made before the jury is selected. Further, the state argues that no language in the statute permits a "conditional motion," regardless of whether the appellant had "reserved" the right to withdraw the motion at a later time. Finally, the state notes that although the appellant argues that his due process rights were affected by the trial court's denial of his request to withdraw the motion, he cites no authority for his argument.

This Court has addressed the issue of when a motion pursuant to Tenn. Code Ann. § 40-35-210(b) (Supp. 1995) may be made. We have held that "the state [or defense] must be given notice of this request prior to jury selection so that prospective jurors may be questioned about the effect that knowing the possible punishment might have upon their verdict." State v. McIntosh, No. 85-27-III (Tenn. Crim. App. at Nashville, May 23, 1986) at *4; see also State v. Bowie, No. 86-212-III (Tenn. Crim. App. at Nashville, Mar. 12, 1987)

In this case, the appellant wanted to withdraw his request well into the trial. To allow the appellant to do so would prejudice the state's case. Once the appellant had been granted his request for the instruction, the state could rely on the appellant's request, which, as we have noted, must be made before the jury is selected. If the trial court had allowed the appellant to withdraw his request for the instruction, then time would have already passed for the state itself to move for the instruction. Therefore, we conclude that the denial of the appellant's request to withdraw his motion was well within the trial court's discretion. This issue is without merit.

VI. Jury Instruction Regarding Possible Release Dates As A Mitigated Offender

Next, the appellant argues that the trial court erred in instructing the jury regarding the possible release dates on the offense charged and on lesser

-18-

included offenses because the instruction included the possibility that the appellant could be sentenced as a mitigated offender. The appellant contends that the trial court erred by charging the jury that the appellant could be released after 1.77 years. The appellant argues that the trial court erred and gave the release eligibility date for a mitigated offender and not a Range I, standard offender, which the appellant was determined to be.

The state maintains that the trial court gave the correct release eligibility dates for the appellant, who was determined to be a Range I, standard offender. The state notes that the trial court used the calculations provided by the Department of Correction pursuant to Tenn. Code Ann. § 40-35-201(b)(2)(B), and thus instructed the jury that "the minimum number of years a person sentenced to imprisonment for the offense of Murder in the Second Degree must serve before reaching his earliest release eligibility date is 1.77 years." Although the number "1.77" appears in the box for mitigated offenders, it is not listed as the minimum figure for a mitigated offender.

Therefore, we agree with the state that the trial court did not err by instructing the jury on the minimum release eligibility date for a mitigated offender. We will, however, address the completeness of the trial court's instruction to the jury regarding sentencing in discussing the appellant's next issue.

VII. Correct and Complete Jury Instruction Pursuant to Tennessee Code Annotated § 40-35-201(b)

The appellant's final issue is that the jury inappropriately considered the jury instructions given as relates to sentencing ranges and truth in sentencing. He contends that the trial court, which on several occasions stated that it believed that Tenn. Code Ann. § 40-35-201(b) (Supp. 1995) was unconstitutional, attempted to correct the statute by deleting the language "weigh and consider" and adding in its place "for information only." The appellant

further argues that despite the trial court's attempt to correct what it believed to be an unconstitutional statute, the jury did consider the dates during their deliberations, which is evidenced by the affidavit of attorney Hershell Koger. Mr. Koger interviewed several jurors after the trial, and in his affidavit, he states that the jury did, at least in some measure, discuss and consider the possible sentences the appellant could receive for the offense charged and any lesser included offenses.

The appellant further argues that the trial court instructed the jury "in a manner inconsistent with the statute as it [the trial court] attempted to correct the unconstitutionality of the statute." Therefore, the appellant argues that the jury could not properly consider the sentencing ranges because the instruction was incomplete. The trial court neglected to include in the jury charge Tenn. Code Ann. § 40-35-201(b)(2)(A)(ii) (Supp. 1995):

> Such instruction to the jury shall also include a statement that whether a defendant is actually released from incarceration on the date when such defendant is first eligible for release is a discretionary decision made by the board of paroles based upon many factors, and that such board has the authority to require the defendant to serve the entire sentence imposed by the court.

The appellant argues that because the jury considered the truth in sentencing information and because it did not receive the entire instruction provided in the statute, his conviction should be reversed.

The state, on the other hand, argues that the trial court correctly rejected the affidavit of Mr. Koger because it "sets forth only hearsay statements of jurors, which should not be considered as evidence of what occurred during jury deliberations." No juror was willing to sign an affidavit concerning the information conveyed to Mr. Koger. The state further contends that had the jurors supplied affidavits, the information in those affidavits would not be grounds to impeach the jury's verdict under Tennessee Rule of Evidence 606(b).

With regard to the appellant's argument that the trial court gave an incomplete instruction under Tenn. Code Ann. § 40-35-201(b) by deleting

-20-

subsection (b)(2)(A)(ii), the state asserts that this issue is waived because the

appellant did not raise it in his motion for new trial or his amended motion for

new trial. Notwithstanding waiver, the state argues that the omission of this

provision of the statute from the jury instruction "did not render the jury

instructions inaccurate, but at worst incomplete."

We will first address the trial judge's comments about the

unconstitutionality of Tenn. Code Ann. § 40-35-201(b) (Supp. 1995) during the

trial and at the appellant's hearing for a new trial. The trial judge stated during

the trial:

> Well, I am of the opinion that the truth in sentencing statute
> as it is written -- not the concept particulary [sic] -- but as it is
> written is unconstitutional because you will note a change from
> my instructions and the statute. The statute says that the jury
> shall consider it in their deliberations.
> In this court's opinion to have the jury take in a matter that
> has nothing to do with guilt or innocence as a factor for their
> deliberations is unconstitutional. I have worded my charge so
> that the jury is not instructed, where requested on the range,
> that the jury -- that language I leave out of my charge. The
> concept I do not think is unconstitutional but the jury may
> be informed for their information only but the language of
> the statute is and I have in this court declared it unconstitutional.
> No one has taken it up.

At the appellant's hearing for a new trial, the trial judge responded to the

appellant's argument that he be allowed to withdraw his request for a jury

instruction pursuant to Tenn. Code Ann. § 40-35-201(b) (Supp. 1995) in this

manner:

> THE COURT: Didn't we have a hearing upon this before
> the trial began which the court expressed grave concerns both
> as to the constitutionality of the statute and didn't the court say
> however, if you ask that I give it that I will have to use -- I will have
> to follow the law. I have grave concerns concerning the
> constitutionality of the statute. I would attempt to fashion
> instructions so as to make the truth in sentencing statute
> constitutional.
> Didn't I relate to counsel for the defense before the trial
> started you are looking at me tellling [sic] them it may be days
> involved?

Later at the hearing for a new trial, the trial judge stated:

> With regard to the other issues raised, the court has
> some concern and expressed those concerns about
> 40-35-201. The nature of the court's concerns will be

-21-

borne out in the transcript of the hearing which was had in this matter. I believe that the court informed counsel for the defense it prohibited the State on their motion for asking for a range of punishment and it is not the range of punishment -- not the numbers that bothers the court. It is the statute which says that the jury will be instructed that they -- for the jury to weigh and consider the meaning of a sentence of imprisonment for the offense charged and any lesser included offenses.

The statute says that the judge shall include in its instructions for the jury to weigh and consider. Well, I do not understand why a jury is to consider something that has nothing to do with the guilt or innocense [sic] of the defendant. To tell the jury they shall consider it causes the court some great concern. Consequently the court altered that language and told the jury that these numbers involved was for their information only. Did not tell them that they shall consider it.

Counsel for the defense is caught in a catch 22. He says well, we believe the jury considered this. If they did they were only following the law. It says they shall consider it. This court didn't instruct them to consider it.

The legislature missed the public concern about truth in sentencing. Rather than informing the juries as to what the sentence was what they ought to do is change the law so that a sentence is what it says it is. Three years is three years or 15 years is 15 years and not 1.77 years.

I cannot find that the court has committed error. The court as well as it could brought its concerns to the attention of trial counsel. The court changed the law or changed or - - did not follow the instructions in the statute in an effort to make sure that the jury considered only the matters that touched upon the defendant's guilt or innocence. So I do not know any more that the court could do. . . .

The court will ask, gentlemen, as an exhibit to this proceeding since you all did not introduce-- that the sentencing range by class which was given to the court by the Department of Corrections dated 6-29-94 which I would ask that a copy of that be made an exhibit to these proceedings so that the court of appeals will know from whence those numbers came from.

. . .

There are-- the sentencing issues will be an interesting matter for the court of appeals to address. We attempted to get a case that was perhaps not quite as serious as this one to frame these issues so that they could rule upon that statute. I do not believe however that the statute-- in the court's mind the statute has some severe problems but the court did not follow the statute in it's [sic] charge to the jury.

This Court has held that Tenn. Code Ann. § 40-35-201(b) (Supp. 1995) is constitutional. See Section IV for that discussion.

With respect to the jury charge pursuant to Tenn. Code Ann. § 40-35-201(b) (Supp. 1995), the trial judge's comments while hearing pretrial motions follow:

> THE COURT: You are aware that the legislature in their truth in sentencing requires the court to charge on the first possible time that a person could be released. That is what the court has been doing on -- I know on a recent case that we had that was an aggravated assault case it worked out to like 51 days. I want you to be aware that is what the court charges. I break mine down in days. I think it is easier to understand than .1 years.
>
> MR. MASSEY: Yes, sir, I understand that. While we are on jury instructions, Judge, if you don't mind me asking would there be a point in time where defense counsel could get a copy of what you would be charging?
>
> THE COURT: Yes, somewhere close to the State's case the court will provide both parties with a proposed charge. Of course a lot of things at that juncture I don't know how to charge. Whether your client is going to take the stand or not, but generally after the close of the State's case I am in a position to formulate a proposed charge which I will give both parties a rough draft copy to inspect and most of the time depending upon progress of the trial I will provide the parties with a final draft before it is charged to the jury.
>
> MR. MASSEY: Yes, sir. As far as requested charges just so I don't miss any deadlines I know if we have any is it the court's preference that we go ahead and get the requested charges filed immediately so that you could see what we were requesting? I looked at the local rules. I didn't see anything in there about instructions.
>
> THE COURT: There used to be a local rule here that you had to have those in within five days preceding the trial. I understand that during the course of the trial that things change. I do not require that any more since I have the use of a computer system it is not as onerous on the trial court to develop a set of charges.
>
> If it is something -- I would appreciate and it is not required-- if it is something that-- especially if you want to deviate from the pattern jury instructions that you file those in advance if you can to give me an opportunity to do a little research before the court makes a ruling on that.
>
> I also charge for your information if you want to start looking now, I generally charge the plain language charges that you will find in the most recent addition [sic] of the pattern jury instructions.

The Tennessee Pattern Jury Instruction[2], Criminal No. 43.11 for the range of punishment follows:

---

[2]The comment accompanying this pattern jury instruction advises the trial judge to "refer to the charts provided by the Department of Correction and accompanying notes for information concerning the calculation of the minimum sentence." Tennessee Pattern Jury Instruction, Criminal No. 43.11, cmt. 1.

The jury will not attempt to fix any sentence. However, you may weigh and consider the meaning of a sentence of imprisonment. The range of punishment for the crime(s) involved herein is as follows:

(Charge range of punishment as set forth in the Sentencing Act.)

You are further informed that the minimum number of years a person sentenced to imprisonment for (this/these) offense(s) must serve before reaching the earliest release eligibility date is:

(Insert appropriate minimum sentence as set forth by the Department of Correction grid.)

<u>Whether a defendant is actually released from incarceration on the date when first eligible for release is a discretionary decision made by the Board of Parole and is based on many factors. The Board of Parole has the authority to require a defendant to serve the entire sentence imposed by the Court.</u>

(emphasis added).

In the case <u>sub judice</u>, the trial court's instruction to the jury regarding ranges of punishment pursuant to Tenn. Code Ann. § 40-35-201(b) (Supp. 1995) follows:

The Jury will not attempt to fix any punishment or sentence, as by law this is a matter that now addresses itself to the Court. However, for you [sic] information only, you are informed that the ranges of punishment as to the crimes involved herein are as follows:

As to the offense of Murder in the First Degree, this offense is punishable by imprisonment in the penitentiary for life. The minimum number of years a person sentenced to imprisonment for the offense of Murder in the First Degree must serve before reaching his earliest release eligibility date is 25 years.

As to the offense of Murder in the Second Degree, this offense is punishable by imprisonment in the penitentiary for a determinate sentence of not less than fifteen (15) years nor more than twenty-five (25) years and in addition thereto, the Jury may impose a fine in any amount not greater than fifty thousand dollars ($50,000). The minimum number of years a person sentenced to imprisonment for the offense of Murder in the Second Degree must serve before reaching his earliest release eligibility date is 1.77 years.

As to the offense of Voluntary Manslaughter, this offense is punishable by imprisonment in the penitentiary for a determinate sentence of not less than three (3) years nor more than six (6) years and in addition thereto, the Jury may impose a fine in any amount not greater than ten thousand dollars ($10,000). The minimum number of days a person sentenced to imprisonment for the offense of Voluntary Manslaughter must serve before reaching his earliest release eligibility date is 138 days.

This Court addressed a similar question regarding a jury instruction pursuant to Tenn. Code Ann. §§ 40-35-201(b)(1), -(b)(2)(A)(I) in State v. King, No. 02C01-9601-CR-00032 (Tenn. Crim. App. at Jackson, Oct. 22, 1996), perm. app. granted, (Tenn. Mar. 10, 1997). The jury instruction given in that case follows:

> The jury will not attempt to fix any punishment or sentence for these offenses. However, for your information only, you are informed that the ranges of punishment as to the offenses are as follows:
>
> AGGRAVATED BURGLARY--imprisonment for not less that [sic] three (3) years nor more than fifteen (15) years.
>
> You are further informed that the minimum number of years a person sentenced to imprisonment for these offenses must serve before reaching the earliest release eligibility date (RED) is:
>
> | | |
> |---|---|
> | AGGRAVATED BURGLARY | 3 YEARS |
> | RED % | 30% |
> | RED % APPLIED | 0.90 yrs. |
> | W/MAX CREDITS | 0.59 yrs. |
> | SAFETY VALVE | 0.54 yrs. |
> | SAFETY VALVE & MAX CREDITS | 0.35 yrs. |
>
> Whether a defendant is actually released from incarceration on the date when first eligible for release is a discretionary decision made by the Board of Paroles and is based on many factors. The Board of Paroles has the authority to require a defendant to serve the entire sentence imposed by the Court.

This Court held in King that the trial court did not err in its jury instruction, finding that "[t]he trial court followed the requirements of the applicable statute as to what must be included in an instruction considering punishment of a defendant." Id. at *3.

A defendant has a constitutional right to a correct and complete charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). A defendant has a right to have every issue of fact raised by the evidence and material to his or her defense submitted to the jury on proper instructions. Poe v. State, 370 S.W.2d 488, 489 (Tenn. 1963). This Court must review the entire charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or

mislead the jury as to the applicable law.  State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

Based upon the record before us, the trial court obviously believed that Tenn. Code Ann. § 40-35-201(b) (Supp. 1995) was unconstitutional, and as the appellant noted in his brief and as the trial court stated in its own comments, the trial court attempted to "correct" the statute.  However, in its attempt to "correct" the statute, the trial court failed to give a correct and complete jury instruction pursuant to the statute or Tennessee Pattern Jury Instruction, Criminal No. 43.11 regarding the range of punishment.

Unlike the trial court in King,  the trial court in this case failed to charge the jury pursuant to Tenn. Code Ann. § 40-35-201(b)(2)(A)(ii), a provision of the statute beneficial to the appellant.  This subdivision of the statute, when included with the other information required by the statute, clearly indicates that whether an individual is released from incarceration on his earliest release eligibility date is "a discretionary decision made by the board of paroles."  To completely delete this subdivision of the statute from the jury instruction undoubtedly gives an inaccurate statement of the law and misleads the jury regarding the likelihood of when a defendant would be released.  Also, the trial court, unlike the court in King, stated only the lowest number in the grid (i.e., the number of years, including  the safety valve and maximum credits if applied) as the earliest release eligibility date.  Consequently, I conclude that the trial court erred in its instruction to the jury pursuant to Tenn. Code Ann. § 40-35-201(b) (Supp. 1995) because the jury instruction misled the jury as to the applicable law.

I must note that  the trial court in King not only included the subdivision in the statute that states whether a defendant is actually released from incarceration is a discretionary decision by the Board of Parole based on many factors, but also included all the information provided in the Department of Correction grid, thereby giving a far more accurate picture of the defendant's

likelihood of release from incarceration than did the jury instruction given in this case.

With respect to the state's contention that this issue is waived and that the jury instruction was "at worst incomplete," I must note that the appellant's failure to raise this issue in his motion for new trial does not waive this issue. This Court may, pursuant to Tennessee Rule of Criminal Procedure 52(b), notice "[a]n error which has affected the substantial rights of an accused . . . at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Because the jury instruction as given failed to conform to the statute or the pattern jury instruction and thereby misled the jury as to the applicable law, I find plain error in the jury instruction. Having found plain error, I, therefore, need not address the issue of impeaching the jury's verdict.

VIII.  Conclusion

We respectfully reverse the judgment of the trial court and order that the appellant be granted a new trial.

_____
PAUL G. SUMMERS, Judge


CONCUR:


(Separate Concurring Opinion)
_____
DAVID G. HAYES, Judge


(Separate Concurring Opinion)
_____
JERRY L. SMITH, Judge